## Norris's Appeal. Brown's Estate.

1. After 21 years from the grant of letters, an administrator or executor may answer to a citation to account or distribute, the lapse of 20 years since he was liable to account, &c.; but the presumption of settlement may be rebutted by proof that *in fact* he has neither accounted nor distributed. Per PAXSON, J.

2. *Distribution* is no part of an executor's account. *Id.*

3. Letters were granted to an executor in 1842; in 1865, a citation was issued under which he filed an account, showing receipts and payments in each year, and that part of the estate remained in specie. *Held*, that the presumption of settlement was rebutted. *Id.*

4. Balances remained in the hands of the executor from year to year, the money being deposited in bank to his private account, and used for his private purposes. *Held*, that he was chargeable with simple interest. *Id.*

5. Under Act of March 29th 1832, sect. 17, compound interest cannot be charged to an executor, administrator or guardian. *Id.*

6. An accountant may be charged as profits with more than compound interest when he has used the money; and be punished by disallowing commissions, &c. *Id.*

7. An executor invested money of the estate in his own name, in stock at a low rate; the stock rose in price. *Held*, that he was liable for the dividends received, and the market value of the stock at the time of the decree. *Id.*

8. The purchase constituted the executor a trustee of the estate, and his possession was that of the cestui que trust. *Id.*

9. Such possession of the stock by the executor was not adverse, the executor having done no unequivocal act, denying the right of the cestui que trust, and the Statute of Limitations did not apply directly or by analogy. *Id.*

10. Investment of trust funds in a trustee's individual name is concealment. *Id.*

11. Imperfect information from a trustee as to funds invested in his name, if calculated to give a false impression, is concealment. *Id.*

12. Where a trustee speculates with trust funds, he may be held to profits if the investment has been successful; interest if disastrous. *Id.*

13. When trust funds can be traced into a particular investment, it belongs to the cestui que trust if he so elect. *Id.*

14. An executor with funds of his own and of the estate purchased stocks; when the investment with trust funds could not be discriminated, the cestui que trust might select the most profitable investments as having been made for the estate. *Id.*

15. Principles upon which commissions and costs are disallowed to a trustee discussed in this case.

February 23d and 24th 1872. Before AGNEW, SHARSWOOD and WILLIAMS, JJ. THOMPSON, C. J., at Nisi Prius.

Appeal from the decree of the Orphans' Court of *Philadelphia:* No. 17, to January Term 1872. In the estate of William Brown, deceased.

William Brown, the decedent, made his will dated August 30th 1841; it was proved March 12th 1842, and letters testamentary granted to Deborah Brown (his widow), Samuel Norris and Isaac

Norris, who were brothers of the widow, they being also the executors named in the will.

· He devised his house and lot in Chestnut street, Philadelphia, to his wife for life, with remainder to his children in fee, the shares of his daughters to be held in trust for them, with authority to the executors, if they thought expedient, to sell the house and lot during his wife's life and invest the purchase-money, the interest to be paid to his wife for life and at her death the principal to be divided amongst his children, the daughters' shares to be held in trust. He gave to his wife absolutely all his furniture, plate, &c. Of the residue of his estate real and personal, he gave one-third to his wife absolutely, and directed the remaining two-thirds to be divided equally between his seven children, viz.: Elizabeth N., William R., George H., Deborah, Mary H., Emily H., and Fanny. He authorized his executors to sell any part of his residuary estate and divide it, or at their option to divide it without sale, if capable of equal division; the share of any child dying under age without issue to go to the surviving brothers and sisters. The shares of his daughters he gave in trust to his wife and George W. Norris, for the separate use of the daughters, with power to the trustees to sell any part of such shares and invest the proceeds for the use of the daughters: on the death of any of the daughters to hold her share in trust for her issue; or for the benefit of such persons as the daughter should by will appoint. He appointed his wife guardian of the persons of his minor children.

The inventory was taken April 13th 1842: the chattels bequeathed to the widow were appraised at $4548. The remainder of the personal estate consisted of bank stocks, and other corporation stocks and loans; it was appraised at $117,896.36, there was also a bank deposit of $2835 not included in the inventory.

Elizabeth N. Brown came of age April 22d 1845.
William R. Brown          "          April 20th 1851.
George H. Brown          "          June 18th 1852; he died April 27th 1856, unmarried and without children, leaving a will: J. Dickinson Sergeant is the administrator .c. t. a. of his estate.

Deborah B. married G. Dawson Coleman, January 13th 1852, and came of age August 15th 1853.

Mary H. Brown came of age December 25th 1855.

Emily H. married Samuel Glover January 15th 1856, and came of age September 13th 1857.

Fanny Brown came of age February 23d 1859.

The widow died February 4th 1864. G. Dawson Coleman is her administrator; he is also trustee of the five daughters.

On the 2d of March 1866, Samuel Norris as "acting surviving executor," filed an account of his administration of the estate in answer to a citation issued in 1865, he died 28th of December 1866.

[Norris's Appeal.]

The charges in the account were the inventory and the cash on deposit, interest and dividends on the assets; differences in the appraised value of assets sold and the amount for which they had been sold; also, some items which appear to be repayments of loans made from the funds of the estate. The whole amount of the charges was $541,883.08.

The credit side of the account was confused by having introduced into it not only items properly belonging to an administration account, but also payments made to the legatees on account of their bequests. The credits for payments as above stated amounted to $412,556.06. Of the balance which would thus be shown, $59,446.16 appeared to be a cash balance.

The items on each side of the account were very numerous; the first date was March 14th 1842, and the last January 21st 1866. There being many in every year.

On the 23d of March 1867, William D. Baker and Joseph A. Clay, Esq.'s, were appointed auditors, to audit, settle and adjust the account and report distribution of the balance.

The auditors accompanied their report with no less than 15 distinct tabular statements of account; to present even a synopsis of these, which would be intelligible, would occupy more space than would be justifiable in a report of the case.

The facts and principles of the decision in the case will appear by the extracts from the reports of the auditors, which are given, and the opinion of the Orphans' Court adopted by the Supreme Court.

The auditors reported: * * *

"Mr. Samuel Norris assumed the entire management of the estate. Mrs. Brown never took any active part in it though it is said that her brother consulted her. She continued to live in the house in Chestnut street, which was devised to her for life, and her children, all of whom were under age at their father's death, resided with her. Isaac Norris, the remaining executor, never acted until after the death of his brother. The three executors, however, joined in the conveyance of the Chestnut street house in 1860, and in entering satisfaction on some mortgages held by the estate.

"Samuel Norris at first began his administration regularly enough, but this regularity lasted only for a short time. He very soon began to keep his accounts carelessly, and to confuse the receipts from the estate with those of his own private affairs, and of other trusts under his charge. Even these mixed accounts were irregular to the last degree. * * * 'This account was made up from loose scraps of paper—from his check-book—his bank books. He had no regular account book for this estate. He was obliged to depend upon these materials and the receipts. He had many memoranda made on loose pieces of paper.'

[Norris's Appeal.]

"There does not appear to be any evidence of wilful mismanagement on the part of Mr. Norris, much less of actual and intentional fraud. It was simply negligence, but negligence to so great a degree that very large balances of cash were allowed to accumulate from time to time, and these were not only mixed with moneys of his own and others, but used indiscriminately with his own funds in dealing in stocks and other securities.

"During the whole period of his administration the executor made payments on account of the income. These payments were made at first to Mrs. Brown, so long as the children were in their minority. When William R. Brown, the eldest son, came of age, Mr. Norris paid him large sums on account of his share of the principal of the estate, until he presumed that he had been paid in full. Afterwards he continued to advance him money under the denomination of loans. A similar course was adopted when George H. Brown, the second son, arrived at his majority. As the shares of the daughters were in trust, no principal was paid to them, but on their severally coming to age, payments of income were made to them, also founded on mere estimates.

"In these payments and estimates, Mr. Norris no doubt acted in good faith. He believed that he was doing justice, and very possibly, that he was paying as much as he prudently should. His great fault lay in never, apparently, investigating the real state of the case; an investigation which must have resulted in the discovery of the immense uninvested balances and their unemployment. He enjoyed for a long time the unbounded confidence of his sister, the testator's widow, and of her children.* * *

"There is no evidence whatever that any of the family surmised for a moment that there were any uninvested balances, nor that any sums of money had been employed by the executor in his own business. Their confidence in his integrity was unshaken, and the complaints which gradually became more importunate until they ended in adverse proceedings, were founded altogether upon his neglect to render any accounts, or to furnish detailed statements of the affairs, and especially of the income of each party. * * *.

"A voluminous correspondence between the parties was submitted to the auditors. The communications between Mrs. Brown and her brother, the executor, were mostly verbal, but about twenty notes from herself and a few from her children on her behalf were presented. These are merely requests for money, without any allusion to the state of the accounts. Several hundred notes and letters from the children to their uncle, were also in evidence—mostly short notes, asking for payments, but in numerous instances inquiring as to the amount of their shares and their incomes. A number of notes of Mr. S. Norris have also been preserved—generally mere answers to requests for money—stating the sum

sent; but occasionally, especially, in the case of the two sons, entering somewhat into particulars.

" The notes from Miss E. N. Brown, the oldest child, eighty in number, begin as late as 1854, and contain only two or three moderate requests for information—once on account of a projected tour in Europe.

" William R. Brown's letters and notes were produced. In February 1852, he began to ask for payment on account of his share of the estate, and by the close of 1856 he had received above $34,000. In his correspondence he expresses satisfaction with his uncle's management of the estate, and in one of his letters, under date of April 21st 1854, he adverts to a statement of Mr. Norris, showing that he had *lent* him up to that time $2800, and he seems to think that it might be more. This statement, which was produced, was merely on account of the payments made to him by the executor, without any estimate of the property on hand. * * *

" George H. Brown commenced drawing money on the 3d of August 1852, a little more than six weeks after he came of age; and altogether up to the time of his death in April 1856, he was paid $34,900. * * * A series of notes asking for money succeed, until March 1855, when he says that he will ' stop and see the statement' of his account. This he afterwards, on the 17th of December, asks his uncle to ' defer' until he sends some money which he had been requested to send. Nothing more is heard of the statement.

" Mrs. Coleman came of age in August 1853. As early as March 30th 1854, she asks her uncle to mention how much she may expect to draw a year. * * * Mr. Norris seems to have given his nieces to understand that their annual income was about $1200. * * Those of the three remaining children, Mary and Fanny Brown and Mrs. Glover, are of the same general character, opening with a request to know what their income may be, and continuing with requests for remittances, on the assumed basis of $1200 per annum.

" Thus, as the children respectively came of age, they required of the executor either payment of their full shares, as was the case with the two sons, whose interest was absolute, or of their income in the case of the daughters, who were entitled to no more under the provisions of their trusts. As already stated, the executor complied with their demands so far as, not only to pay, but according to his own estimate, to overpay William and George Brown. For the cestuis que trust he fixed on $1200 per annum as the approximate income of each of them, but in no instance, except the statement rendered to William Brown, is there evidence of anything approaching to an account.

" The amicable relations between the parties, protracted for so long, and the confidence mutually existing between Mrs. Brown

and her brother, led to the assumption that the whole management of the estate had been a matter of tacit arrangement, and that it was out of the power of the legatees to take advantage of errors, supposing them to exist, arising from such a state of facts. A preliminary question was thus raised, which was argued at great length by counsel, and decided by the auditors before proceeding to settle and adjust the account itself.

"The counsel for the accountants claimed,

"1st. That from the lapse of more than twenty years from the death of the testator, a presumption arises that the acting executor performed his ordinary duty, and settled an account at the end of a year from the decease.

"2d. That there is further presumption, that under an arrangement between Mrs. Brown, the widow, acting in her own right and as guardian and trustee for her children, and the executor, he acted, after the settlement of his account, as *agent* for the devisees and legatees, and consequently is amenable only in that capacity and not as executor.

"These presumptions were alleged to be confirmed by the acquiescence of Mrs. Brown, during her lifetime, and by the correspondence of her children with the executor."

The auditors decided both these questions against the accountants. They then proceed : * * * "The auditors have carefully considered these arguments and authorities, in connection with the facts of the case.

"These facts show that the acting executor, a man of high character and unblemished reputation, of intelligence and mercantile capacity, intrusted with the management of an estate of large amount, began the execution of his trust with diligence and accuracy. Acting under an unfortunate misapprehension as to the condition of the estate, he took no steps towards settlement and distribution, but retained the whole property in his custody. Then began the careless conduct already mentioned. The payments to Mrs. Brown and investments made in the name of the estate never absorbed the entire receipts. Large balances accumulated yearly. These were mixed with his own moneys, and those of other persons, and no full account of the receipts kept anywhere. Admitting the claim made by the heirs, that he employed the money of the estate in stock speculations, to its fullest extent, there still remain large annual sums, which cannot be accounted for in this way. Whatever the executor may have done with them, they did not remain idle in his hands, for his bank books have been produced and they exhibit balances very far indeed below the sums which the account, as filed, shows to have been in hand.

"Beyond the large and somewhat excessive payments to the two sons, no capital was distributed and no attempt, even, has been made to show how the uninvested balance was employed.

21 P. F. Smith—8

" Still there are some extenuating circumstances.  The relations between the executor and his sister, who was trustee for her daughters, and represented her sons in their minority, were extremely confidential, and if, on the one hand, he was careless and irregular, she, at least, never seems to have demanded anything beyond the payment of so much of the income as sufficed for the immediate wants of the family.  To this extent she acquiesced in the executor's management ; though there is not the least proof that she assented to his use of the funds of the estate, nor that she knew or even suspected anything of the kind.  This mere acquiescence cannot exonerate the executor. * * * The length of the acquiescence seems to have been misunderstood.  Mr. Brown died in 1842.  The estate was retained, or was supposed to have been retained by the executor for two or three years at least, under the advice of Solomon Allen.  Captain Brown came of age in 1852, and almost immediately began his demands for a settlement.  The same course was pursued by his brother and by the daughters, so far as regarded their income, which was all they could personally claim.  All this shows, first, that there was no such absolute lapse of time without demand of payment as would warrant any presumption of settlement, and next, that the only real acquiescence, even of Mrs. Brown, extended to the mere retention and management of the estate by the executor under the erroneous supposition that he was managing it judiciously.  Moreover, if this assent be admitted, it was an assent that Mr. Norris should continue to act as executor of the estate, not as the banker of the parties themselves. * * *

" There being thus no valid excuse for the negligence of the executor, the consequences of his conduct are to be considered as they affect first, his liability to a surcharge of *interest ;* secondly, his liability ,to a surcharge of *profits ;* and thirdly, his right to *compensation.* * * *

" 1. *As to surcharge of interest.* * * *

" The liability of the executor to account for income actually received by him is, of course, admitted and a surcharge of interest is no more than adding income which he ought to have received.

" The executor, however, in addition to his neglect to invest the funds in hands, used large portions of them for his own purposes, and for this reason and on account of his general irregular management, the counsel of William R. Brown claimed to charge him with *compound* interest.  Such a claim may be urged on two grounds—first, that where interest is not paid over as it accrues, but is allowed to accumulate, the accumulated arrears ought, in justice, to be carried to the account of principal and not suffered to lie idle—and this leads to a system of rests : and secondly, that the interest should be compounded as a penalty for mismanage-

ment or other improper dealing with the fund on the part of the executor. * * *

"It may be considered as settled, that no system of rests of any kind can be adopted in Pennsylvania, where the trustee has been merely negligent or careless. For the use of the money of the estate for his private purposes, he may be made liable for profits, but in neither case can the charge of interest be compounded.

"2. *As to a surcharge of profits.* * * *

"Whether it may or may not be the duty of an executor, in any particular instance, to invest or not, he brings himself within these rules by attempting to deal with the property in any way for his own advantage, and whenever this is done in the way of trade or private speculation, he may be charged, at the option of the parties interested in the estate, either with the profits, if his dealings were profitable, or with interest, if that should prove more advantageous to the parties.

"The chief use made by Mr. Norris of the mixed funds in his hands was dealing in stocks and bonds of the Reading Railroad Company, though he also purchased and sold other securities. These speculations were generally profitable, but were sometimes unfortunate. Wherever the funds of the Brown estate can be traced into particular investments, and these were retained, the purchases are to be taken as made for the estate—and the stock should either be transferred to the surviving executor, or charged to the accountant at its market value. Where the money cannot be distinctly traced into specific purchases of the stock, when purchased was resold, or where, if retained it cannot be discriminated, the counsel for the heirs claimed the right to select the most profitable investments as having been made for the estate—a demand which was vehemently contested. It is nevertheless founded on a correct principle and most fully supported by authority. * * *

"The employment of trust funds in purchases for the trustee's own account and in his own name, is more than this mere negligence. The motive may not be fraudulent, but it is dealing with the property in an illegal manner, and by no means constitutes an innocent or excusable confusion of goods, such as would come within the exception to the rule. The Reading stock itself, was easily distinguished. The confusion was in the funds employed in the purchase of it. With any regular system of accounting, the executor could have traced every one of his purchases to the proper source, and then no difficulty could have arisen.

"No attempt has been made on behalf of the executor in the present instance, to distinguish between stocks bought with money of the estate and those with his own money or with that of other

[Norris's Appeal.]

parties. The only course pursued has been a denial of liability to account for the stock. It is, therefore, a lenient measure, according to the cases, to charge only what can fairly be estimated to have been purchased with the estate's funds, and, in so doing, to select the best and most profitable investments. There has been not only no attempt to distinguish the purchases, but it is plain from the state in which Mr. Norris kept his accounts that discrimination is impossible. If a trustee has sold stocks of an estate and has applied the money to his own use, he may be charged with the highest market price of the stock between the sale and the time of charge. It is only a different application of the same principle when a trustee who confuses stocks and renders no distinct account of them, is charged with the best stocks as investments for the estate he represents.

" 3. *As to the right to commissions.* * * *

" It is the settled practice of the court to refuse commissions to any trustee who has been shown to have used the trust funds for his own private benefit. Making every allowance for the confidential and affectionate relations of the parties in the present case, it is impossible to give them more than the weight of an excuse. They may palliate negligence, but they cannot entitle to reward. Whether the delay in accounting be considered, or the necessity for legal proceedings to enforce a settlement, or the use of the moneys in business, it is equally clear that commissions cannot be allowed, while Smith's Appeal shows that it is the neglect itself—without regard to the kindness which may have prompted it—that entails a denial of compensation.

" Stress has been laid on the honest intentions of Mr. Norris, and the auditors have already said that nothing like deliberate or intentional fraud can be imputed to him. Except, however, as to the moral guilt of the transaction, it makes little difference to the parties entitled to the estate, whether an executor by employing their funds in trade for his own benefit exposes them to hazard through negligence or absolute dishonesty. Morally he is by no means as guilty when he states an open account, which shows on its face the balances he used, as when he seeks by a fictitious account to screen his frauds altogether—but practically—if the facts are once disclosed—the motive is of no great consequence to the cestui que trusts. Interest is awarded to them alike in either case, as a compensation for the use of their money, and profits or investments may be equally followed and appropriated, whether made by an honest or dishonest trustee, if made from the funds of the trust estate. It is thus that so little distinction exists between the measure of compensation to be made by a merely negligent trustee and the measure of punishment dealt out to a faithless one. It is, in fact, compensation only in either case, that the law considers when merely settling an account. Punishment is really

an inappropriate term.   There are, as already said, other means for punishing a wilful defaulter.   It is the same with compensation for services of the trustee.   This is as readily denied in the one case as in the other.   Negligence or fraud where they lead to mismanagement are alike in their consequences in this respect also.

" It is as unjust that cestui que trusts should be made to pay for services never rendered, as it is that they should be made to pay for services unfaithfully rendered.

" For these reasons all claims for commissions, in the present case, are disallowed.

" 3. *Costs of the audit.*

" The counsel for the legatees also ask that the costs of the audit should be charged to the accountant.   This the auditors decline to do. * * *   The principle is well established that where an accountant is in default, or where delay or expense are caused by his conduct, or where litigation arises either from his setting up claims which prove to be unfounded or from resisting demands, which are well-founded, he may be visited as a penalty by a charge of the expenses occasioned by his misconduct or by the whole cost of the proceedings.   Still the costs of a cause are eminently within the control of the court, and more discretion may be exercised concerning them than in the cases of surcharge of interest or of profits or even in the allowance or denial of commissions, all of which depend upon fixed principles for effecting justice between the parties.   Sufficient compensation has been afforded, in the opinion of the auditors, for the evil effects of the careless management of the executor and for his speculative dealings, by the heavy surcharges already made, without a further imposition of the costs.

" The costs of the audit are therefore charged to the estate of William Brown, but without any allowance for fees of counsel. Such fees, to any amount, could only be asked for the defence of the accountant from claims of surcharge which have nevertheless been maintained, and all the cases show that in litigations moved or defended by an executor or other trustee, his success is the chief criterion of the allowance of his expenses. * * *

" As to the adjustment of the account.

" The accountant is to be charged

" 1. With the receipts contained in the account filed.

" 2. With sundry omitted items.

" 3. With the profits made on the sales of temporary investments, assumed to have been made with the funds of the estate.

" 4. With the dividends received on permanent investments, assumed to have been made with the funds of the estate.

" 5. With interest on the uninvested cash in his hands; reserving constantly the sum of $2000, as a fund for contingencies.

" He is to be credited

[Norris's Appeal.]

" 1. With the investments stated in the account as made for the estate.

" 2. With the sums paid in discharge of the testator's debts and for taxes and other incidental expenses.

" 3. With the payments made to the widow and children of the testator and stated in the account; together with several omitted credits of the same nature.

" 4. With the sums assumed to have been paid for permanent investments, selected for the estate, under the ruling of the auditors —but not admitted by the account.

" The stocks treated as permanent investments will be charged to the accountant specifically out of the stocks held by him in his own name, together with the shares received as stock dividends.

" In conformity with these views the auditors have re-stated the cash account.

" In this statement the accountant is charged with the cash received in 1842, the first year of his administration—with the exception of the cash specified in the inventory and received by Mrs. Brown.

" The accountant is then credited with his payments during the year and the sum of $2000 is deducted from the balance. Simple interest is then charged on the remaining balance from January 1st 1843 to January 1st 1844. In 1843 the accountant is charged with his receipts and credited with his payments. The auditors then specify certain purchases of stock made and sold at a profit. These are assumed as temporary investments made with the funds of the estate. The profits are added to the cash balance for the year and interest charged on the aggregate from January 1st 1844 to January 1st 1845. It must be well understood that the interest ·thus charged annually is *not* added to the annual balances, nor in any way made itself the subject of a charge of interest. The annual charges of interest are added together at the foot of the statement, and the same result is thus produced as if all the annual cash balances of principal had been added together and an average date ascertained in the ordinary mercantile way, and interest then calculated on the whole principal to March 2d 1866, the date of the filing of the account. The rest of the statement is made up in the same way.

" Where permanent investments in the Reading Railroad stock are assumed to have been made for the estate, the amount invested is deducted from the receipts of the year in which the investments were made, before charging interest. Where cash dividends were declared by the railroad company on the stock thus purchased, they are added to the receipts of the year.

" Sundry payments, accidentally omitted in the account, are credited where they belong.

" The investments assumed as permanent, consist entirely of stock

of the Philadelphia and Reading Railroad Company. In selecting them as made for the estate, the auditors were guided not merely by the fact that large uninvested balances had accumulated in the executor's hands at the dates of the purchases. In most cases funds of the Brown estate appeared to have been received, within a comparatively short period preceding the investments, sufficient for making the purchases even after deducting the payments within the same period on account to the estate. * * *

" In 1858, the Planters' Bank of Tennessee declared dividends on the stock held by the estate amounting to $2000. In 1859 the dividends declared by the bank amounted to $3000—in 1860 to $3050, and in 1861 to $1020. These dividends were regularly paid over as they accrued to the agents of the Planters' Bank in Philadelphia. Although Mr. Norris had previous to 1859, collected the dividends of the Planters' Bank regularly, as will be seen by the account, he entirely neglected to collect the subsequent dividends and suffered them to remain where they were deposited until his death. They have since been received by the surviving executor, Mr. Isaac Norris. No explanation was given of this neglect, except that the accountant was not aware that the dividends had ever been declared. This is no excuse, even if it had been proved that the Planters' Bank had changed its agency, which was not shown to have been the case. The previous dividends had been duly collected, and there is nothing in the circumstances to relieve the executor from a charge of the various sums in the years in which he ought to have collected them, with interest from the end of such years respectively, as in the case of his acknowledged receipts.

" In the years 1853, 1854 and 1855, the executor, as has been already stated, made very large payments to the two sons, William R. Brown and George H. Brown. In order, apparently, to supply the deficiency occasioned by these payments, or, according to the theory of the auditors, to reimburse himself for the advances, the executor sold 600 shares of Philadelphia and Reading stock for $29,400. This is assumed to have been a sale of so much of the permanent investments of the estate. The amount is, therefore, charged to the executor in the statement of the receipts and payments of that year, and the shares sold are deducted from the aggregate of the stock investments.

" In order to ascertain the amount of the shares of the two sons when the large payments to them commenced, the auditors have prepared a statement, exhibiting the state of the estate on the 1st of January 1853. The stocks embraced in the original inventory and the investments actually made by the executor up to that date, are set down at a valuation carefully made for the auditors by Messrs. Fell & Brothers, well known brokers of this city, who have appraised the stocks at the current market price of that day

as nearly as it could be ascertained. To these are added the cash balance of uninvested principal at that date, the interest surcharged to the same time, together with the assumed investments in Reading Railroad stock, and a stock dividend of that company, appraised by the same brokers. The entire aggregate amounts to $346,380.88. One-third of this sum is then deducted as the share of Mrs. Brown, and the remaining two-thirds divided by seven : showing the share of each of the sons at that time to have been $32,983.89. As the sons, as they respectively came of age, were entitled to the whole of their shares absolutely, no distinction is drawn between principal and prior arrears of interest. If the executor had settled with them, as he did to a great extent, they would have been entitled to both indiscriminately. It would have been manifestly unjust to have appraised the assets of the estate in 1853 at the rates of the original inventory. The other children will receive their shares of the same assets, either specifically or at the prices of the present day. Substantial justice, therefore, can only be effected by the plan adopted by the auditors." * * *

(The auditors then state the individual accounts of the two sons as to the personal estate.)

An account of the real estate, commenced with the sale of the house in Chestnut street on the 17th of April 1860, for $55,000. This sum is charged as principal, and credit is given for the expenses and commissions of the sale, for the purchase-money mortgage of $40,000, and for the sum of $14,278.57 invested in Reading Railroad bonds, afterwards exchanged for stock of that company, leaving an uninvested principal of $135.80. The executor is charged with the interest received on the mortgage and bonds, and credited with payments of interest on a mortgage on the house in Spruce street, bought for Mrs. Brown, down to the death of that lady on the 4th of February 1864. Interest is charged on the surplus receipts of the executor to the date of the filing of his account on the 2d of March 1866. The balances of income belonged to Mrs. Brown until her death, and, as these balances remained unpaid, her estate is entitled to the interest surcharged upon them to the date assumed for the general division of William Brown's estate.

"Prior to 1853 all the payments, except for taxes, &c., were made to Mrs. Brown. The auditors have not undertaken any distribution of these payments among the children, but have assumed that they were received by Mrs. Brown and appropriated to her own support and that of her children generally. They report that such an appropriation is no more than a reasonable allowance and such as the court would have made on timely application, where all the parties lived together and were supported out of the common fund." * * *

[Norris's Appeal.]

The balance of the account was adjusted by the auditors, to March 2d 1866, the date when it was filed.

A statement accompanying the report shows that upon the facts found and the principles adopted by the auditor, the balances at that date were:

| | |
|---|---|
| Cash;—principal and income | 154,022.39 |
| Investments | 250,922.27 |
| | $404,944.66 |

The auditors reported also a table of distribution of this sum as of the date last mentioned. The accountants filed fifty-six exceptions to the report of the auditors, involving the questions of law and fact, and also asserting errors in calculation and statements of the account. Some of the latter were ascertained to be well founded, and alterations accordingly made in the report: the others were overruled.

W. R. Brown filed two exceptions: one that the accountant should be charged with compound interest; the other that the costs of the audit should be charged to the accountant.

G. D. Coleman, administrator and trustee, filed an exception similar to the second exception of W. R. Brown.

The auditors overruled these exceptions, and inasmuch as *some* of the exceptions of the accountants were sustained, they divided the costs of the hearing on the exceptions between the accountant and the estate.

After hearing in the Orphans' Court, the opinion of that court was delivered, July 8th 1871, by

PAXSON, J.—"Fifty-nine exceptions have been filed to the report of the auditors in the above case, of which fifty-six were filed by the accountant. The three remaining exceptions were filed by William R. Brown, and by G. Dawson Coleman, administrator, distributees under the will. The issues involved are important, whether we measure them by the amount in controversy, the questions involved, or by the number of exceptions. Instead of considering the latter in detail, we will refer to a few general principles which form the basis of the greater portion of them. They may be briefly stated thus:—

"1. The liability to account after the lapse of more than twenty years from the death of the testator.

" 2. The surcharge of interest.

" 3. The surcharge of profits.

"4. As to the right to commissions.

" 5. Costs of the audit.

" We will consider them in their order. The counsel for the accountant claimed that, by reason of the lapse of more than twenty years from the death of the testator, a presumption arises

that the acting executor performed his ordinary duty, and settled an account at the end of a year from the grant of letters testamentary.

"Legal presumptions are of two kinds, viz.: First, such as are made by the law itself, or presumptions of mere law, which are conclusive; and, second, presumptions of law *and* fact, which are not absolute, and may be rebutted. The presumption in this case evidently belongs to the latter class.

"There is no doubt as to the general principle, that after the lapse of twenty years the presumption of payment arises, whether the obligation be a bond or other specialty, or the liability be to account to heirs, legatees or creditors. The rule is thus correctly stated in Foulk *v.* Brown, 2 Watts 209 : 'After a lapse of twenty years, all evidences of debt, excepted out of the Statute of Limitations, are presumed to be paid. Within the twenty years, the onus of proving payment lies on the defendant; after that time it lies on the plaintiff to show the contrary.' If an executor or administrator be cited to account more than twenty-one years from the grant of letters testamentary or of administration, he may reply to the citation that, twenty years having elapsed since he might have been called to account, the law presumes that he settled an account within one year, and distributed the estate among those entitled thereto. By the law of this state, an executor is entitled to one year within which to settle his account. During that period he cannot be cited unless for misconduct, and it would seem the presumption would commence to run from the expiration of the year, or the time when he might have been called upon for an account. But it is at best only a presumption, liable to be rebutted by proof that in point of fact no account had been filed and no distribution made. And when overthrown by such evidence, the liability to account remains in full force. In this it is unlike the Statute of Limitations, which interposes a flat bar to a recovery after the expiration of the statutory period. The practical effect of the presumption is merely to shift the burden of proof.

"In this case we think the presumption relied upon has been entirely overthrown. In the first place, the account filed of itself rebuts it conclusively. The accountant commences by charging himself with the inventory made in 1842, and goes on with numerous and continuous dealings with the estate, receipts and disbursements, up to and during the year 1866, showing a considerable amount of the estate unadministered at that time. Payments were being made by the accountant up to the period of his death of interest to some of the distributees. Nor is there any averment upon the face of the account that any balance that might appear to be in his hands at the time of the filing of the same had been distributed. There is no pretence that any such account actually existed. This account was commenced

[Norris's Appeal.]

by the accountant just before his death, and was completed by his co-executor, who had not taken any part in the management of the estate prior to that time. In the account filed there is no charge of a balance of a former account, nor any credit of a former distribution. Nor could there well be in this case, as the account commences, as before stated, with the inventory and first dealings with the estate. The proof is overwhelming that there never has been any accounting other than what is contained in this account. The correspondence between the executor and the children of the testator also negatives the presumption of a settlement. It commences years back with requests for money. Then come inquiries as to the state of their accounts. These inquiries gradually became more pressing—amounting to a demand in 1856, and culminating in a citation in 1866. It must be remembered that the accountant was the brother-in-law of the testator; was a man of fortune, of high social position, and appears to have had the unbounded confidence of his nieces and nephews, who were the distributees under the will. All these, and many other facts stated by the auditors, lead us irresistibly to the conclusion that no account was settled by the accountant, and in the face of facts, mere presumptions disappear.

"The accountant relies upon McLean v. Findley, 2 Penna. R. 100; Foulk v. Brown, above cited; Wilkinson's Estate, 1 Pars. 171; and Com. v. Snyder, 12 P. F. Smith 157, in support of the principle, that the mere admission of assets by an executor's account, filed within the twenty years, is not sufficient to repel the presumption of payment of legatees arising from the lapse of more than that space of time without demand on the part of the legatees. The settlement of an account showing the receipt of assets more than twenty years before might not rebut the presumption of payment to the legatees or parties entitled thereto. It was said, in Foulk v. Brown, that the mere settlement of the administration would not be an admission that the legacy was not paid. The distribution is properly no part of an executor's account. Yet, without some positive averment on the face of the account that the balance appearing therein had been distributed, it is difficult to see how any conclusive presumption of payment can arise. The law of each case must be interpreted by its facts. The presumption, if any, arising from the filing of a particular account, must be measured by the circumstances of the case. Thus, in McLean v. Findley, the effect of filing the account is said to have been very properly left to the jury as a matter of fact; and in Wilkinson's Estate, Judge Parsons says, 'When the executors present their account, and in it claim that a legacy has been paid, when the law presumes the satisfaction, they can avail themselves of this legal presumption.'

"The accountant here has done something more than file a mere

[Norris's Appeal.]

administration account. It is also, to a certain extent, a distribution account, commencing in 1843, and containing a large number of payments on account to the distributees, down to as late as January 21st 1866. Does such an account furnish any presumption of payment to the distributees as to any sums not embraced therein? On the contrary, does not such a statement repel the presumption of any payments not enumerated? There is nothing upon the face of the account, nor was there any claim before the auditor, that the accountant had paid, over twenty years ago, the estate to the parties entitled to receive it. On the contrary, we have here an account filed, not only admitting assets, and a portion of the estate unadministered, but a continuous dealing with the estate from 1842 down to the filing of said account. There is no break or interruption in it from which the presumption of payment might reasonably be supposed to begin. As was well observed by the learned auditors, ' when there is a blank of more than twenty years between the receipt and the filing of the account, without intermediate action, a fair presumption of payment may be drawn; but where there is a series of receipts and payments without any interval at all, even if twenty years or more have gone by since the first came in, where is the presumption to begin, and where is it to end? Are the items more than twenty years old to be barred, or those nineteen or eighteen years old, and all the rest to remain as charges?'

" It must be borne in mind that we are dealing here with presumption—with that which is at best only primâ facie evidence, and liable to be rebutted. The accountant professes to give us his dealings with the distributees from the commencement of the trust. Can it be said that a statement in his account, that upon a certain day he paid one of the distributees a particular sum of money, furnishes any presumption that upon some other day he paid some other sum of money to the distributee, and for which he has claimed no credit?

" It was further alleged, on behalf of the accountant, not only that the law conclusively presumes a settlement of the account more than twenty years ago, but that since that time the accountant has merely acted as the agent or banker of the distributees, in which capacity he is not liable to answer to them as executor.

" This position is an ingenious one, to which the learned counsel for the accountant were evidently driven by the admitted fact of his dealings with the estate up to the period of his death, and that a considerable portion of it was in his hands at that time.

" There is nothing in the facts of this case to warrant this presumption. It is conclusively overthrown by the fact that the transactions referred to are included in Mr. Norris's account as executor. If his relations to the estate had been changed from that of an executor to a banker, his accounts while acting in the latter capa-

[Norris's Appeal.]

city would have no place in his account as executor. That his dealings with the estate during the period in which he acted as agent or banker, as is alleged, have been included in the administration account by Mr. Norris himself, and no motion made by his counsel since his death to strike out any portion thereof, would seem to be conclusive upon this point. Even if the position referred to were tenable, the auditors give some excellent reasons why it would not help the accountant; the most important of which is, that the Statute of Limitations, in such cases, does not commence to run until the dissolution of the relation of attorney and client, or agent and principal, where, as here, there were continuous dealings with the estate. That this is so, is settled by Campbell v. Boggs, 12 Wright 525, and Lichty v. Hugus, 5 P. F. Smith 434.

·  "The second point for consideration is the surcharge of interest. The auditors find as a fact that large balances remained uninvested in the hands of the executor from year to year. He kept no separate bank account, but deposited the money of the estate to his private credit. His bank account showed that the money had been drawn out and used by him in his private business and speculations. The auditors, in surcharging him with interest, have allowed him to carry a balance of $2000 for contingencies, and a reasonable time for investment.

"We think the auditors clearly right in their view of this branch of the case. The liability of an executor for interest, where there is neglect or mismanagement, is too well settled in Pennsylvania to need authority. Much more so when he has used the funds of the estate, as in this case, for his own gain. See Fox v. Wilcocks, 1 Binn. 194; Walthour v. Walthour, 2 Grant 102; Bitzer v. Hahn, 14 S. & R. 232; Merrick's Estate, 1 Ash. 305.

"The auditors refused to charge the accountant with compound interest, in which we think they were right. I know of no instance in which any man has ever yet paid compound interest by the judgment of a court of this state. It is true the Supreme Court, in the cases of Hughes's Minors' Appeal, 3 P. F. Smith 500; Harland's Account, 5 Rawle 323; Light's Appeal, 12 Harris 180; Springer's Estate, 1 P. F. Smith 342; Dietterich v. Heft, 5 Barr 87, intimate that in cases of 'very gross delinquency,' they might charge an accountant with compound interest. It is to be noted that they have had a number of such cases before them, and have never yet held an accountant to such a rule. The liability of an executor for interest in this state has been the subject of legislative enactment. By the 17th section of the Act of 29th March 1832, Purd. 300, pl. 65, it is provided, that 'the amount of interest to be paid in all cases by executors, administrators and guardians shall be determined by the Orphans' Court, under all the circumstances of the case; but shall not in any case exceed

the legal rate of interest for the time being.'   It would seem difficult, in the face of this Act of Assembly, to charge compound interest, *as such*, in Pennsylvania.   An accountant may be held to much more than compound interest by a surcharge of profits, when he has used the money of the estate; and he may be punished for misconduct by disallowance of commissions, and in other ways, as the circumstances of the case require.

"The auditors have made a heavy surcharge for profits realized by the accountant from the use of the trust funds.   The most of the latter were employed in speculations in Reading Railroad stock, although many purchases were made of other stocks.   At the time of Mr. Norris's death he was a large holder of Reading. The auditors find that a large portion of these stocks were purchased with funds belonging to the estate of William Brown, and as to such they surcharged the executor with the dividends received thereon, and with the present market value of the stock, crediting him with the amount actually paid therefor with interest thereon. Reading stock is much higher than when purchased by Mr. Norris. The application of this rule results in a great gain to the estate of William Brown.

"We are left in no doubt as to the facts upon this point of the case.   Upon page 76 of the printed evidence, we find the following statement by the auditors :—

" 'In returning the evidence, under the affidavit and rule relating to the use of trust funds in the purchase of stock with which the accountant has been surcharged, the particulars are not stated, because it was admitted before the auditor, as a matter of fact, that the evidence did trace the trust funds of the estate of William Brown, in the hands of Samuel Norris, deceased, into the stocks, &c., with which he is surcharged by the auditors.'

"In the face of this clear admission we have only to apply the law to the facts as above stated.   The effect of the purchase of the stock by Mr. Norris, with the funds of William Brown's estate, was to create a trust in favor of the latter.   The possession of the trustee was the possession of the cestui que trust, and the trust was beyond the bar of the statute, or any analogy to it. Such possession cannot be adverse until the trustee has done some open, unequivocal act denying the right of the cestui que trust. Prior to such act on the part of the trustee, the statute would not run : Abbott *v.* Reeves, 13 Wright 494; Walker *v.* Walker, 16 S. & R. 384; Angell's Lim., section 174; Thompson *v.* McGaw, 2 Watts 162.

"In the present case the auditors find that 'no one of the beneficiaries was aware of the stock investments of Mr. Norris until they were traced by Mr. Burke, their accountant, after the account had been filed.   There is no evidence of a previous suspicion of the fact, nor could the investments have been discovered by any

but a practised accountant. * * * An investment of trust funds in the trustee's individual name is always a concealment, and imperfect information is equivalent to concealment, if given in a way calculated to give a false impression. There was nothing in the relations of the parties in the present case to arouse suspicion, but everything to lull it to rest. The implicit reliance placed on the integrity of Mr. Norris by the whole family is evident throughout, and it would be a hard administration of equity to visit them with the consequences of a supposed laches under such circumstances.'

" Upon the argument it was strongly urged by counsel for the accountant that the Act of 1856, limiting the right of action in cases of implied trusts at law, should be applied by analogy to the case of a constructive trust. It required an Act of Assembly to bar the right of action in an implied trust at law, and it is said in Hill on Trustees 265, that the Statutes of Limitation can scarcely be held to apply to these equitable cases. The learned author cites a number of cases in the book referred to, where relief has been refused when the parties have delayed their claim for eighteen or twenty years; but these cases depended somewhat upon their special circumstances, and they admit the principle that ' mere lapse of time will not of itself be always a bar to relief.' And again : ' The party entitled to the benefit of the . trust must have been aware of his rights, and must have acquiesced in being deprived of them by the trustee.'

" No such state of facts exists here. The parties benefited by the trust never knew of the application of their money to the purchase of the stocks referred to until the fact was discovered by an accountant after the account was filed. They never acquiesced in it. The securities so purchased were held by the accountant up to the time of his death, and now form a part of his estate. With the gains of these operations with the trust funds confessedly in his hands, we should be loth to apply such a rule as is contended for here. We are glad to be able to say that, in our judgment, the law does not require us to do so.

" It is a well-settled rule that where a trustee speculates with the trust funds he may be held to profits or interest, at the option of the cestui que trust. Profits, if the investment has been successful, and interest, if it has been disastrous. In no event will the trustee be allowed to make a profit out of the trust fund. The law holds out no inducements to trustees so to misapply the estate. He may lose, but he cannot make by so doing. It is equally clear that when the trust funds can be fairly traced into the purchase of any particular stock, the latter shall be held to belong to the estate, if the cestui que trust so elect. The cases upon this point are numerous and strong. Among them may be mentioned, Hall's Appeal, 4 Wright 409 ; Miller's Appeal, 6 Casey 478, 493 ; Robinett's Appeal, 12 Id. 191 ; Oliver v. Piatt, 3 Howard 333 ; Cal-

laghan *v.* Hall, 1 S. & R. 241; Wiley's Appeal, 8 W. & S. 244; Emeret's Estate, 2 Pars. 195; Docker *v.* Somes, 2 Myl. & K. 655; Attorney-General *v.* Alford, 4 De Gex, McN. & G. 843; Hart *v.* Ten Eyck, 2 Johns. Ch. R. 62; Lupton *v.* White, 15 Ves. 432; Chedworth *v.* Evans, 8 Ves. 46.

" The auditors also declined to allow the claim of the accountant to commissions. In this we think they were right. Commissions are allowed to the faithful steward for his care, trouble and responsibility in the management of the estate. The decisions differ somewhat as to what amount of negligence or misconduct will deprive a trustee of his commissions. The Supreme Court has been more lenient in some cases than in others. The true rule is perhaps stated in Holman's Appeal, 12 Harris 174: ' It is hardly necessary to say, that where there is no evidence of a proper attention to the duties of the trust; where no account has been settled for thirty years, and then only where a settlement was compelled by law; and where a very unfair exhibit was made when the account was presented, no compensation ought to be allowed to the executor.' Commissions were disallowed in Stehman's Appeal, 5 Barr 413, 417; Witman & Geisinger's Appeal, 4 Casey 376; Smith's Appeal, 11 Wright 424; Swartswalter's Account, 4 Watts 77; Stearley's Appeal, 2 Wright 525; Dyott's Estate, 2 W. & S. 557; and Robinett's Appeal, 12 Casey 191, for reasons in nowise stronger than exist in the case now under consideration.

" The auditors have charged the costs of the audit to the estate of William Brown, but without any allowance for counsel fees. Costs are peculiarly within the control and discretion of the court. It is to be noted that the auditors state their belief that the accountant, in his exceedingly irregular dealings with the funds of the estate, did not intend any actual fraud. The distinction between such a trustee and a fraudulent trustee is a very nice one, and we think the auditors have taken as charitable a view of this branch of the case as it will bear. It is of but little moment to the cestui que trust what the motive of the trustee may be, if his act be such as to imperil the estate.

" Where a trustee uses the trust funds in speculations for his private gain, the character of the act does not depend upon the success of his operations. If he loses the money in such transactions, and is unable to replace it, the law has a name for such an offence, which we will not designate here, but which is well understood by lawyers, and ought to be by laymen. This investigation has been greatly protracted, and the expenses thereof heavily increased by the accountant's improper management of the estate, and by his failure to keep proper accounts. It is not just that this increased expense should be paid by the distributees.

" The auditors have divided the costs of the hearing upon the

exceptions, for reasons which we think are satisfactory; and we direct the costs of the audit also to be divided—one-half thereof to be paid by the estate of William Brown, and the other half by the accountant. We would throw a larger share of the costs of the audit upon the accountant, but for the fact that the distributees have not been as vigilant as they might have been in calling him to an account. Their delay has probably contributed to the increased expenses.

"In considering these general principles, I have answered most of the exceptions filed. Those that remain refer in most part to matters of detail. The auditors have sustained some of the exceptions in their supplemental report, and modified their rulings as to others. After a careful examination of them in detail, I am unable to perceive any errors in the rulings of the auditors as modified by their second report.

"The exception filed by George Dawson Coleman as administrator and trustee, and the second exception filed by William R. Brown, are sustained to the extent of one-half of the costs of the audit, while one-half is to be paid by the accountant. All of the remaining exceptions to the report of the auditors are dismissed, except in so far as they have been sustained by them in the supplemental report.

"A decree can be prepared covering the question of costs, and confirming the report, without sending the latter back to the auditors."

In accordance with the foregoing opinion the following decree was entered:—

July 8th 1871. The exceptions to the report of the auditors having been heard and considered, it is ordered and decreed that the exceptions filed on the part of the representatives of Samuel Norris are overruled, and that the exceptions filed on behalf of William Brown and George Dawson Coleman, to the ruling of the auditors, on the subject of the expense and costs of the audit, are allowed; and that the said costs and expenses be paid one-half by the accountant. And, in accordance with this, it is ordered that the sum of $1479.56, being one-half the costs which have been charged to the legatees, shall be paid by the executor of the said Samuel Norris, out of the assets of the estate of the said Samuel Norris, in addition to the amount and assets awarded to be paid and delivered by the said accountant, that is to say: to the executors of Deborah Brown, $493.18; to William Brown, $164.39; to George Dawson Coleman, trustee, $657.70; to the executor of George Brown, $164.39; in all, $1479.56. And all other exceptions are overruled, and the said report, as modified by the supplementary report, upon the exceptions filed before the auditors, is, in other respects, confirmed.

The executors, &c., of Samuel Norris appealed to the Supreme

21 P. F. SMITH—9

[Norris's Appeal.]

Court, and in a number of specifications assigned the decree of the Orphans' Court for error.

*W. H. Rawle* and *E. S. Miller*, for appellants.

*Chapman Biddle*, for W. R. Brown, appellee.

*R. C. McMurtrie* and *G. W. Biddle*, for G. D. Coleman, administrator and trustee, appellee.*

Judgment was entered in the Supreme Court, March 4th 1872.

PER CURIAM.—This case is so well discussed in the opinion of the learned Judge of the Orphans' Court, that for the reasons given, the decree of the Orphans' Court is affirmed.